Good morning, Your Honors. I am Sigmund Popko, and I represent the appellant Jesse Moore in this matter. I will first turn to the issue of biparty. Can you give us some sense as to – I know your time is limited. Can you give us some sense as to how you intend to divide up your time? Yes, Your Honor. I am going first. Obviously, I'm going to – we've each agreed to take roughly the six minutes and 40 seconds that we have amongst us. I'm going to try to reserve some of that for rebuttal. I forget which one. Mr. Maynard is going to go second, and then Ms. Fisher is going to go third. Okay. Thank you. I'm going to turn first to the issue of my client's incompetence to stand trial. The judgment of the district court should be reversed in part because Mr. Moore was incompetent to stand trial, and the district court should have so held. It erroneously found him incompetent in part because it did not give due weight to the testimony of the defense attorneys at the – that was presented at the competency hearing. This uncontroverted testimony showed that he did have – excuse me – did not have the present ability to have a rational ability to understand – or excuse me – to consult with his defense counsel, and thus that led to an unreliable determination of guilt. The judge seemed to just zap the attorney's evidence entirely in making that ultimate decision. It kind of – it sort of looks that way. Assuming that that's wrong, I take it what we do is send it back to the court and say, do it right, and then tell us, was he competent or not on that particular issue? I mean, I'm not talking about the exclusion issue, but just that issue. On this particular issue, I think what would happen, Your Honor, is that the judgment does get vacated, the sentence would be vacated, and he would have to go back. I'm not familiar with being able to do a retrospective determination of competency for a trial that one has already had. It's a right not to be tried if you're incompetent. And so I think he would be entitled to a new trial. Oh, sure, but what if you were confident? At that time. Horror of horrors. The judge has it all and reads all the stuff from that time and says, I've done it again, and he was competent. Then, not today, then. Maybe at the end. I'm pending another appeal. Right. Okay. Thanks. It was undisputed and agreed by all the experts at the competency hearing that Mr. Moore did have a mental disease or defect. He was a victim of fetal alcohol syndrome. He abused substance abuses. He had psychosis. He was probably paranoid schizophrenic. He was on antipsychotic medication at the time. The jail had put him on that. He tested with a reasoning ability in the lowest two percentile, and he had a working memory in the lowest one percentile, which Dr. Connors suggested was basically a working memory of 20 to 60 seconds. All the experts agreed that he had a problem with reasoning with higher-level hypotheses and abstract thought. And this prevented Mr. Moore from having a rational ability to consult with his defense counsel, which is what Dusky requires. Dusky requires a rational ability to understand the proceedings and a rational ability to assist your defense counsel. Is that what the experts said, though, that he had an inability to assist his counsel? Two of the experts did. Dr. Morens and Dr. Connor, who testified for the defense, both agreed that he was unable to presently assist with his defense counsel. Correct. And the Court found otherwise based on the testimony of the other? The Court found otherwise by ignoring the testimony of the defense counsel and focusing on the conclusion of Dr. Walsh. Counsel, did the Court ignore defense counsel? I thought the Court said the fact that from the lawyer's viewpoint, the defendant has not assisted and has caused the lawyers the extreme frustration and heartache. They have spoken eloquently, and I don't disregard what they said. The Court said the fact the lawyers have experienced this is of no moment, is not what I'm saying. So the Court considered the lawyer's testimony, but just didn't feel that it outweighed the evidence that the Court elected to credit. With respect, Your Honor, I disagree with that characterization. The Court did mention that it saw that the defense attorneys were experiencing frustration with a client's rejection of a plea offer against legal advice. That doesn't talk about any of the other materials that the defense counsel brought for the district court to consider. For example, Mr. Moore did not testify because he did not rationally understand that he could testify in support of his own defense of alibi without being labeled a snitch. I understand your argument, but I don't think it's fair to characterize the district court as having ignored the testimony of the attorneys when the courts explicitly addressed that testimony. It did address the judge in that very narrow manner, but I still believe that it was not given the due weight that a ---- That's a better argument. In the short time that's available to you, could you please address the exclusion of the mental health expert testimony? Yes, Your Honor. The mental health experts were Drs. Moran and Dr. Conner. Dr. Conner was previously disclosed to the government. She was involved in a case from nearly the very beginning when this was a death case. She was appointed by the court. All of her records were disclosed. She was ---- there was a motion for a 12.2b notice to be filed on the mens rea issues. That was filed within the time that the court extended, and the court had put, with the exception of Dr. Conner, unless previously disclosed. Well, she was previously disclosed. It was clear error for the court to exclude her sua sponte. The government did not even ask for reconsideration on Dr. Conner. Their main complaint was about Dr. Moran. And the problem there was Dr. Moran was appointed late into trial, excuse me, close to trial, before the trial began. And he was unable to produce a report by the time the ---- of the disclosure deadlines. You know, quickly, but it strikes me that your problem is that, sure, Dr. Conner was disclosed. She was disclosed for another purpose at another time. Yes, she was on the witness list. No question about that. She was not disclosed for this particular purpose at this particular time. So maybe counsel tripped. The question is whether the penalty was too harsh for the tripping. Is it not? She was disclosed. The evidence was the same. The evidence for the mens rea is the same.  So if there was a failure to disclose, there was no prejudice to the government, because it's not new evidence. It's the same type of evidence. Right. Thank you. Okay. You took seven minutes, but we'll make sure to give you a little time for rebuttal. Okay. Thank you, Your Honor. Daniel Maynard on behalf of Joseph Fuentes. Mr. Fuentes was denied a meaningful opportunity to present a complete defense because the court restricted evidence concerning the investigation of the government and the theories of the government. In this particular case, we attempted to put on evidence. The government's theory was that Mr. Fuentes had paid for or had wanted an individual killed because he had testified against members of Fuentes's family. There was the only individual who had actually testified against members of Fuentes's family or anyone in the underlying case had been brought into the prison in November, approximately five months earlier. The evidence showed or would have shown, had the jury been able to hear the evidence, that once Mr. Fuentes had seen this individual in the prison, he had approached a prison official who had been with the prison for over 17 years, advised him in secret that this individual's life would be threatened or he would be harmed, and that he asked that this individual be removed from the prison yard. The prison official did that. The individual was removed. And when we tried to put that evidence in in front of the jury, the court denied it. Denied it, first, out of the grounds of relevancy, and then second, as contending that we were bringing it in for character evidence. Your Honor, the evidence was admissible for a number of reasons. First off, it didn't have to go to character. It had to go to the investigation of this particular case. The chief investigator had asked any of the prison individuals to let them know if they had any information that would bear upon the killing that occurred. The Mr. Dillinger sent an e-mail, which is Exhibit 203, which was never admitted into evidence, which is part of the investigation. It went to Investigator Barton, and yet Investigator Barton was not able to testify about that e-mail, which was evidence that he had collected as part of this investigation. Additionally, we brought in Mr. Dillinger to testify about what Mr. Fuentes had said. Now, keep in mind, this is part of this whole investigation because the government's theory is Fuentes had wanted someone killed because they had snitched against his family in the underlying case. You have this exact facts in this case that had happened five months earlier, and the Court determines that it's not relevant. And on what basis do we review the judge's exclusion? Is this an abuse of discretion standard? On an evidentiary ruling, you look at an abuse of discretion standard, and then you look to determine whether or not it's harmless error. And we contend that it wouldn't have been — it cannot be harmless error to exclude this type of evidence. Also, under the Fifth Amendment, we believe that you would look at a de novo because it denied him due process. He was not able to put on a complete defense. He could not contest exactly what the government's theory of this case was. How long would it have taken to put in that evidence? I'm trying to get my head into the district judge's head into how long was this going to take and so on. Exhibit 203 was a one-page e-mail that said, Joseph Fuentes approached me about a prisoner who testified against individuals in his case, and — Yeah. But we were going to — but it was going to take a while because we were going to have to say, well, what kind of testimony did he give against the family? You know, just to flesh it out, because the government's going to want to respond, it's going to take a while. In a five-week trial, this would not have taken more than a half an hour or an hour to flesh this out. Okay. This is not going to be much. Okay. But we've got Dillinger, who is working for the Bureau of Prisons on the stand, who's going to testify about how he made the document, why he made it, the conversations that he's had for Fuentes, and why he felt compelled to do what he did. You can have Fuentes, who then testifies about why he went up there. It goes to whether or not he has motive, whether he's — Okay. Assume for the moment that I'm willing to go so far as to say that it was an abuse of discretion. I assume without deciding. Why is that harmless error? There was an awful lot of other evidence against Mr. Fuentes. The evidence against Mr. Fuentes was there was no physical evidence against Mr. Fuentes. Their only evidence was from the three prisoners who came in and testified. And as I hope I pointed out in the brief, I approached it a little differently than general, but their testimony was inconsistent. It was contradictory. Every piece of evidence in this case was important. And the evidence concerning how Mr. Fuentes treated Mr. Romas not only went to the investigation of this case in the government's theory. It also went to contradict what Mr. Aguilar had stated. Because Mr. Aguilar stated that Mr. Fuentes had gone to him and asked him to hurt him, that his testimony is the chief testimony that is against Fuentes. This testimony would have been the chief testimony that Mr. Aguilar had said. I don't believe you argue that it should be admitted in order to impeach that particular witness. I argue that in part in the briefs, Your Honor. Now — I'm talking about in the court. I don't believe I saw the argument that — now, that might have been more interesting If A says, well, he asked me to hit him, and he wants to bring in evidence to impeach that, that, you know, if I were district judge, that would be an interesting line of impeachment. It's a heck of a lot less interesting to say, well, he let one snitch, he helped out one snitch, and therefore, you should infer he didn't go after the other snitch either. That's a little more icky. But the other is kind of direct. I don't think I saw that argument being made to the court that was being admitted to impeach that particular piece of evidence. Am I wrong? I honestly don't recall, Your Honor. Okay. Well, let's say it wasn't. Well, I'm not sure that it wasn't. Why should we take it up now? Because we were bringing it in several different occasions, when Fuentes was on the stand, when Barton was on the stand, and when Richards. I understand all your becauses. I'm just saying, if you say to me as a judge, look, I want to impeach X, great, I can rule on your objection. I can rule on your issue. If you're telling me I want to bring it in because it's a blue sky outside, it's a little more iffy, no? I would agree with that. Okay. I think I have to turn over my time, Your Honor. All right. Thank you. Good morning. I'm Carmen Fisher. I represent Mr. Pablo, and I represented him at the trial. The reason this conviction and sentence should be reversed and a new trial ordered is because Mr. Pablo did not get a fair trial. If he had gotten a fair trial, he would have been acquitted not just of murder, aiding and abetting murder, as it was charged to the jury, but with the conspiracy as well. The problem was that he was tried with the co-defendants, and every issue before you really stems from him being tried with his co-defendants. The evidence against Mr. Pablo in the 16-day trial consisted primarily of four witnesses. Detective Barton, who saw him tearing up letters on June 20th, the murder was on May 9th. Detective Barton's comment about the crip suspect, which came in, was brought in by a co-defendant's attorney. Mr. Aguilar's testimony about overhearing or being a participant in conversations between Mr. Pablo and Mr. Fuentes, and Mr. Delacruz's testimony about overhearing Mr. Fuentes and Mr. Markoff talking about needing to talk to Mr. Pablo about this, and, of course, the Keith Thomas testimony. None of this testimony showed he was a participant in this murder, and that is why the jury acquitted him of aiding and abetting in the murder. They convicted him of conspiring in the murder, I believe, because of all the other evidence that came in from the co-defendants, the evidence that he was a crip that came in, which I do not believe was waived. If you look at the excerpts of records starting at page 82, you'll see my objection and my constant continuing to object with or against this evidence coming in from the inmate profile. And the case law indicates the judge needs to be given an opportunity to know the opportunity. The sum of the argument was it's not fair, Judge, to let him bring in what's on an inmate profile form. He doesn't know where the information came from. He doesn't know how old the information is. We don't know if it's accurate, it's inaccurate, it's irrelevant, it's 404B. Well, they said he was the same officer who said he was a suspected crip said that the crips aren't disruptive in this prison, so we're not really that concerned about them. There was plenty of evidence that he was involved in the particular racial group and was making coup there, and you've got Thomas' testimony that he was taking over for him to lead this hit, et cetera, et cetera. There's lots of evidence about his being part of what's called the Native American gang, if you want to call it that. And the crip thing is sort of out there. I realize Yellowman said, I'm not a gang member. You haven't got me pegged to some group except as a shaman, maybe, or whatever it was. I was locked up. You've got his confession, which the jury didn't accept. You got that from Yellowman, I agree. But it looked to me like the crip was pretty marginal compared to what else was going on in this trial. If it hadn't been, perhaps, the gang, the crips, I might agree with you. Excuse me? If it hadn't been a gang as notorious as the crips, I might agree with you. And as far as him being a suspect, my recollection of the testimony is Detective Barton said that the computer was set up in such a way, unless it's a security threat group, then it would only enter as a suspect, not a member. But I agree he was associated with the Native Americans, but he was he is a Native American, so he was associated with that. And how do how do I know that being associated with a rolling 22, was it crips? Rolling 30s, East Side Crips. Rolling 30s, whatever it is, the Rolling Something Crips. How do I know that's notoriously a horrible gang? Where do I derive that from this record? From Detective Barton's testimony about the Crips are a nationwide organization founded in Los Angeles, and they have different sets. How many of the other people involved in this were also members of the Crips? I know that so-called Speedy, Mr. Case, was. Were the others also Crips? Mr. Thomas admitted association with the Crips, I believe. Okay. Now, it seems to me that another argument you have, and it's in your brief, although you don't emphasize it much, in favor of severance was because Mr. Yellaman was tried along with everybody else, Mr. Yellaman's clear statement at the beginning as part of his confession that Mr. Pablo was not involved is never in front of the jury. Right. And that was obviously prejudicial to Mr. Pablo, that he would not, that was taken out and the pronoun put in, and we objected to that coming in. And as it turns out, I'm not sure where we are. But on the other hand, I mean, if it's going to be everybody tried together, I think you have no choice but to take out at least some of those names. But they took out the good part for us. They took out the part where he says it wasn't, Pablo wasn't involved. Right. They took out the good part for you, and they took out the bad part for the others. Just put in sort of generic pronouns, all a bunch of others. Yeah. I think I'm over my time. Why don't we hear from the government, and we'll make sure that each one of you has some time for rebuttal. Thank you very much. Good morning. May it please the Court, Linda Boone and Joan Rufinock for the United States. I will address the issues of Defendant Moore, and Ms. Rufinock will address the issues for Defendants Pablo and Fuentes. Your Honors, in a situation which could have been straight out of an HBO episode of Oz, the prison drama, this district court used a common-sense application of the facts to the law to determine whether or not Defendant Moore was competent. And Hoski, cited by the defendant, was not to the contrary. What this Court noted in Hoski was that the reasoning, the reasoning, that is what the Court focused on, and the government witness's opinion was not supported by the record. The reasons that the government witness used were not logical. The government witnesses weren't supported by the record evidence. The defense evidence, again, in support of Defendant Hoski being incompetent, was that he could not retain even a rudimentary understanding beyond a few minutes, and the government evidence did not refute that. And further, the government expert had relied on the defendant's ability to perform mechanical functions as evidence of his competency. And the Court found that those reasons were not supported by the record and not appropriate for the determination, and therefore, it was error for the district court to assign greater weight to the government's expert than to the defendant. That's not the case here. What Dr. Potts, the government expert, did was he pointed out to the district court that the people who knew the defendant most, who had spent the most time working with him, were not aware that he had some voices speaking to him, were not aware that he had asked for medication to help him sleep. After two evaluations by Dr. Conner, an evaluation by Dr. Hoyt-Croft, and the assistance of the mitigation specialist, Mary Goody, the defendant had never mentioned and none of these experts had ever noticed that he was bothered by any voices. But the defense kept seeking authorization for additional expert assistance, and it was only when they got Dr. Morantz that the defendant ever mentioned that. And let us also note that Dr. Potts mentioned that the voices and the medication being the only basis for the hearing, the defendant himself reported that he could suppress those voices by concentrating on something else, such as reading or exercising. So the defendant himself and the defendant's experts did not refute this. The defendant himself said that those did not stop him. If I may, if I can take another cut at the question of the exclusion of the testimony from Dr. Conner and Dr. Morantz. Conceded that deadlines weren't satisfied. Yes, Your Honor. What's the standard that would allow the district judge to exclude that? I think it's a higher standard than merely that they missed a deadline. Isn't that correct? Yes, Your Honor. And in this case what's the standard that should be applied here? It's abuse of discretion, Your Honor. No, no. What's the standard that the district judge is supposed to apply as the district judge says, I'm going to exclude this expert, this expert mental testimony? If, Your Honor, the United States v. Peters, by this Court, found that you should have a willful and blatant misconduct necessary for exclusion. But, as I pointed out in my --- It's basically willful and designed to somehow obtain some tactical advantages. Tactical, yes. However- It seems to me there's no showing that we have willful attempt to obtain tactical advantage. We may have mistaken meeting the deadlines. I don't see a deliberate willful attempt to gain tactical advantage. The government would disagree, Your Honor, because- Okay. Yes. Tell me how I can see that or how the district judge saw willful attempt to obtain tactical advantage. Yes, Your Honor. If there was only one example, say if it was just that Dr. Conner had not been given the formal statement, I would absolutely agree and say, no, there was no willful and blatant attempt to gain tactical advantage. But, as I pointed out in my brief, the defense did it over and over and over again For Dr. Moretz, he had never given a report. For Dr. Goldstein, they had never given the opinion. For Fite, the alibi witness, they had never given notice. These incidents, the Court, and I noted in- How does that Fite alibi witness help you or hurt you? I mean, we're not talking about that testimony. No, Your Honor. But I'm saying that's an example of what the district court was looking at when it was making these decisions. It wasn't the one time. It was over and over again. But the over and over again may suggest, pardon me for suggesting this, incompetence. Incompetence. Incompetence. Rather than deliberate attempt to obtain tactical advantage. I hate to say it quite so baldly, but sometimes you make mistakes because you make a mistake and you were incompetent in making the mistake. I would agree with that. I have to say, and I guess the word incompetence is so strong, I don't intend to mean by that we are at the level of ineffective assistance of counsel. That's a separate question. Okay. But making a mistake is different from doing something deliberately in order to gain tactical advantage. Your Honor, I agree. However, the government wants this Court to consider that the district court had chastised the defense counsel for its failure several times, and even when they found that it was definitely prejudicial to the government and that the government hadn't had notice, they still allowed the defense to proceed. Because what they did was every time the district court denied a witness, the district court made certain that the defendant was not totally blocked from its objective. Just because, Dr. Koenig ---- Well, wait a minute. Yes, Your Honor. Did the district court cut out Dr. Conner? Yes, Your Honor, but ---- Now, wait a moment. Let me finish. What did I say? And I think you can see that if that were all that went to it, that's pretty bad. Cuts out Dr. Morins. They'd asked to appoint Dr. Morins earlier, if I recall correctly, and the district court said, nope. Then they finally asked to appoint him again for this purpose. The district court appointed him and said, and have his report here in what amounted to six days. They weren't able, they couldn't get Dr. Morins to talk to him within that six days, and so they told the government, look, we want to call Morins and here's what we think he's going to say. But they didn't have his report yet, so they didn't submit his report, and the district court says, okay, Morins is out of here too. I can understand that maybe they were doing some, let's just say they were doing stuff that wasn't entirely appropriate at other times. But those two doctors are the core of his defense, of that part of his defense. There's that other doctor, but she's sort of an alcohol person and she's limited. And they're both just shut out, you know. Where do we find willfulness as to both of those folks? You Honor, the willfulness is, first of all, found with the failure to provide the proper notice for Dr. Connor, and even if you find that that is not willful, you then have their failure to use Dr. Hoyt Croft when the defendant argued to the court that he could, that he believed diminished capacity defense could be presented by Dr. Hoyt Croft. And then the next day, after they had rested and didn't present Dr. Hoyt Croft, they argued to the court that her testimony would not have been sufficient. So that's why I was proper to scratch him. You Honor, Dr. Morenz ---- I know we'd like to switch to Dr. Hoyt Croft, and I understand that. But let's talk about, Dr. ---- the scenario regarding Dr. Morenz and the fact that he's shut out. Dr. Morenz, the only thing the government can say about Dr. Morenz, Your Honor, is that the defendant knew from February of 2004 that it was an issue and did not ---- Wait a moment. That's great. But it seems to me that gets assumed when the district court goes ahead and appoints him and says, fine, I'm going to give you Dr. Morenz so he can testify on what you see you want him to testify on. You've got to have him here in six days. That's what I'm asking about. I'm not asking about stuff that happened before. I'm asking about right then. The district court says, okay, you can have Dr. Morenz. Yes, Your Honor. And what I'm saying is that the defendant put themselves in that position of having only a limited time for Dr. Morenz, and the court had pointed that out to the defendant. Yes, you're asking, first of all, you had Dr. Connor, and that was the reason for the first denial, because the district court said, you already have a psychiatrist. You don't need another one at this point. And then when they continued to ask for Dr. Morenz, and it wasn't until August that they asked to have the experts appointed for that purpose, then the court said, all right, I'm going to give you Dr. Morenz, but you've already said that Dr. Connor and Dr. Hoyt Croft would support the defense you want. But I'm going to exclude Dr. Connor, so here we are. Right. The district court only excluded Dr. Connor, Your Honor, because of the position of the failure of the defendant. Okay. I understand. But yet and still, the court made sure on the representations of defense counsel that he could proceed with Dr. Hoyt Croft. Okay. Your Honor, my time is up. Thank you. Thank you for your questions. And now we have asked the other two defendants. Correct. The government's theory in this case regarding the murder of Jesus Lopez And could you give your name for the record? I'm sorry. Certainly, Joan Rufinock on behalf of the United States. Thank you. The government's theory never changed. Mr. Fuentes was the instigator, Mr. Pablo was the facilitator, and Mr. Moore was the actor. The defendants all presented similar defenses. They argued that the government didn't prove its case because all of its witnesses were liars and its investigators were incompetent. So the government submits that there were no grounds for severance in this case. They were properly tried together and that there were no errors by the district court. With regard to the 404B evidence that was argued, Mr. Dellinger's memo was offered for state of mind of Mr. Dellinger. The district court found that Mr. Dellinger's state of mind was not relevant and therefore the court excluded that document. And although the court excluded the memo itself, Mr. Fuentes was permitted to get in significant testimony in support of his theory that what he did with regard to Mr. Lopez or what he would have done is consistent with what he did with Mr. Romas. And that specifically is that he acted in conformity and that conformity was to do a good act in trying to get rid of Mr. Romas from the prison because he feared from the state of mind. How much evidence was he able to put in in terms of what he did with respect to Mr. Romas? Significant evidence, Your Honor. They were able to get in testimony that Romas had testified against co-defendant Markoff, that Fuentes saw Romas on the yard in December of 2000 causing him to go see Dellinger to reveal something, that as a result of what he revealed to Dellinger, that Dellinger reported the matter to prison officials and that because Dellinger and the reason Dellinger did that is because Dellinger believed it was his duty to report matters concerning the safety of inmates. And further, that Romas then left the FCI facility immediately thereafter. And I'd cite the court to SCR 736 to 37, 991 to 93, and 996 to 98. With that significant evidence in front of the jury, defendant's theory was clearly argued and was supported by the evidence. The jury simply chose not to accept it. With regard to defendant Pablo's argument on the inmate profiles, that evidence came in during the course of a 16-day trial. It was simply the statement that Mr. Pablo was suspected of being a member of the Rolling 30s Crips. Well, that's not quite what that testimony said. Mr. Barton says he's a member, then he says he's a suspect, and it's not clear as I read that testimony, if I'm sitting in the jury box listening to that, it's not clear to me whether he said he's a member or a suspect. He stumbled over his words. That's absolutely correct, because he said member and then he corrected himself and said suspect. Well, I'll just read it to you. He's a Rolling 30s Crip gang member or suspect, excuse me. Question. And again, what does that mean? You use the term member and then you said suspect. Is that a significant distinction? In the STG program, as it was set up at the time, the suspect assignment, we didn't assign members per se. You only assign suspects, only suspects in the security group, threat groups. Membership only came with disruptive groups. I mean, that's the extent of it. Now, if I'm a juror, I don't quite understand why he said suspect and member. It doesn't quite sound by the time he's finished as though he made a mistake. It sounds as though there's something else going on and I can't figure it out. So he says suspect, but he also says member, and I can't tell what he meant. But clearly association. Okay. Clearly association. And, but I'd submit to the court. Some kind, you know, whether proven. I don't know. Yeah. Okay. I'd submit to the court, though, that that was the sum and substance of what came in with regard to that evidence, that there was never any argument that Mr. Pablo was a gang member. There was never any further discussion about Mr. Pablo being a gang member. You're quite right, because the Yellaman defense attorney makes quite a point. It's he who's interested in getting this evidence in, and then he makes quite a point at argument in front of the jury. Mr. Yellaman is not a gang member like all the rest of these guys. Your Honor, I believe that Yellaman's, and I apologize to the court. My luggage was lost, so I don't have all my excerpts of record to point specifically to my pages. But I believe that Yellaman's testimony or argument was that all of these people have association. All of them are related by reservation, and many by gang. But I submit to the court that what he was referring to was Keith Thomas, Mr. Aguilar, as opposed to Pablo or Fuentes, because if the court reads that argument closely, they'll see that Mr. Pablo says or, I'm sorry, that Mr. Yellaman's counsel argues, you know, I'm not saying that they've done anything, because Mr. Pablo specifically said that they didn't during parts of his statement. And there are significant reasons why you should not believe the government witnesses. And so Pablo never points the finger. And he says Yellaman had nothing to do with the gangs, nothing to do with drugs, nothing to do with the parties in this case. And he says, you heard testimony, they keep track of gang members, they track inmates for violence potential, groupings, associations, they tune into the leaders maybe, nothing about Yellaman, that's what he says about it. We've heard about Crips and LVL and Ninth Street Gang, et cetera, et cetera. Mr. Yellaman, any part of that? No, to the same effect, right. So there was a reason Mr. Yellaman wanted that in there, and then he used it. Absolutely. He argued he was not associated with those people. And part of the association was Crips. To some extent, Your Honor, but if you also look at how the Crips evidence came in, Mr. Barton was cross-examined regarding that by all counsel. Mr. Thomas was a Crip. That's why that evidence came out extensively. Mr. Aguilar. And Mr. Thomas is a Crip, and the argument really is that Thomas gets Pablo to do this. That sounds as though that, you know, that's not the only piece of evidence, but it sounds as though that's a relevant piece of evidence. But the evidence was much stronger with regard to their connection as far as reservation. The government's evidence was that the connection between the individuals in the prison was according to racial groupings as opposed to any kind of gang membership. Gang membership in street gang parlance. Street gang evidence was introduced by defense, not by the government. Yeah, I know. And part of the trouble I'm having, I mean, this overlaps substantially with the severance argument. The government wants all these people in together, and it's going to be clear in all kinds of severance cases that the defendants like to point their finger at one another. And, I mean, that's why the government wants them all in there so that everybody looks guilty. That's why the defendants want to be put apart. But putting Mr. — particularly putting Mr. Yellowman in, I think, worked to the severe disadvantage of Mr. Pablo. That is to say, we get this in. We also get taken out the exculpatory statement that Mr. Yellowman had made. So partly I'm after whether the severance ruling is right. Partly I'm after whether or not allowing this in. But they're linked. I mean, the reason we have to have this — the reason this comes in is that Yellowman wants to make an effective defense, for which I don't blame him in the least. He wants to say, listen, I'm not like those guys. On the other hand, it's evidence that seems to me error to have admitted. And it was also evidence when he says, listen, he didn't have anything to do with it,  that evidence could have been kept out. Why is this fair to have Mr. Yellowman tried at the same time as Mr. Pablo when we have these consequences? Because in order to have — because there weren't mutually antagonistic defenses. While Yellowman's argument was — Well, I didn't quite say that.  Well, I'd submit to the — That is to say, I just gave you what I think are two important things that happened. Both of them to the disadvantage of Mr. Pablo. Both of them resulting from the fact that they're being tried together. And had they been tried separately, neither one would have been true. Well, but the test before the Court is, were they mutually antagonistic? Did you have to acquit either Yellowman or Pablo because of their individual cases? And the government submits that that's not the case because they, in fact, had similar kind of defenses where they were attacking the government's case. Now, in addition, Yellowman had a second argument, which was, I wasn't associated with these people. But if you look at the test that this Court has established, were they mutually exclusive? Did you have to acquit one if you convicted the other? That's not the case here. So — and the Supreme Court has said, just because you have a better chance of being acquitted because somebody else is not tried with you is not the test for determining severance. Okay. So perhaps it wouldn't have been more fair to try them separately. But was it error? No. Okay. Thank you. Now, why don't we try two minutes each on rebuttal, see what happens. Thank you, Your Honor. I will take less than two minutes. Okay. First, just a point of clarification. Dr. Conner is not a psychiatrist. She is a neuropsychologist. Dr. Morens was the only psychiatrist that the defense sought for appointment in this particular case. With respect to the competency issue, I would just point out to the Court that Dr. Potts admitted at the competency hearing that he did not observe, as he would normally have, that that was part of the practice, the interaction between defense counsel and the defendant to see if there was that ability, the rational ability to assist in the preparation of a defense. And he did not do that in this case. And then finally, with respect to the Voices issue, that was not the crux or the basis for the finding by Drs. Morens and Conner that Mr. More was incompetent by virtue of being unable to assist his defense counsel. It was his defective reasoning ability, which has all the other causes that I mentioned earlier and that are in the brief. The Voices was just one little symptom, and the agreement was over the extensiveness of the Voices, not that he was even hearing them. But certainly, if you read the competency hearing, that was not the crux of the defense expert's conclusions. Thank you. Thank you. Your Honor, to address a couple of the issues, the government said that Fuentes was able to get in a great deal of evidence concerning what Dillinger's testimony was in Exhibit 203. Granted, I may have nibbled around the edges, but the judge restricted us from getting into specifically what happened concerning Mr. Romas, concerning Mr. Dillinger, concerning the email that he prepared as part of this investigation. As the government pointed out, the jury was told that at some point when Romas was seen by Fuentes, he goes to Dillinger and then Romas is removed. But they're not told that he's removed because Fuentes doesn't want to have him harmed. The jury could have drawn the inference from that that Fuentes was wanting to harm this individual and had told Mr. Dillinger that because they had a close relationship, because Fuentes was teaching GED courses that Mr. Dillinger was in charge of. So we don't know what inference that the jury drew. But what we do know is that the judge didn't let the evidence in that would have shown exactly how Fuentes had reacted concerning the exact fact scenario that the government used as the basis of their case. Your Honor, is there any question that if the evidence concerning Romas had been that Fuentes had wanted Romas injured and it had happened under the same fact scenario, whether the government would have gone in under 404B and whether or not the district judge would have allowed this evidence in? I think not. Thank you, Your Honor. Okay, thank you. As to Mr. Pablo, he sat pretty mute through most of the 16-day trial. We had four witnesses about him. Those were six days. After the eighth day of trial, we just sat there. The government rested on the eighth day, and the co-defendants put on their defenses. The government put on rebuttal. Mr. Pablo didn't testify. We didn't present a defense. I think that, coupled with being tried with Yellowman, with Yellowman portraying him as a crip, and the connection between Thomas, Pablo, and Mark Case that was left with the juror was that they were all crips. Mark Case also a crip. They were all crips. A.K.A. Speedy. Speedy. They were all crips, and they were all from the Salt River Pima Reservation, which wasn't accurate in some of my cross-examination. I brought that out from Mr. Thomas, that Mr. Pablo is actually a Gila River Pima Indian. And also, of course, the Court wasn't there and didn't see, but Mr. Pablo is quite large. Mr. Thomas was quite large. They're both Pima. They're both related that way, I guess. But the crip information coming in left this painting on Mr. Pablo that he was he chose to be a gang member. He was born Native American, but he chose to be a crip. He's loyal to Mr. Thomas because of that. And the whole case is based upon what he was told to do and what he talked about with other people. There was not one shred of evidence that he actually did anything other than talk. And that, I believe, is the reason the jury found him not guilty of aiding and abetting in this murder. And the Barton testimony about member or suspect, what I took away from that, and I think jurors could have taken away, is, well, he was a member, but we really don't have that box on the form, so he's a suspect, based on what he said. And I think the jurors certainly could have found he was a member of the crips. And I think that's the reason we have such an odd verdict, that he didn't do anything to aid and abet and assist in the murder, but he conspired to do it. Well, it's odd from your standpoint. If you believe the testimony that came in against him, particularly from Aguilar and from Thomas, he conspired. I mean, that's what they said. Well, they said that he was told to do certain things, and he said he knew about the plant. There is nothing to show more than he was puffing with Aguilar in front of Aguilar, and that Thomas is telling him, do this, do that, and we haven't even figured out what's cracking, shit, shit, meaning carry out the murder as planned. And there's nothing to show that he was doing more than getting directions from Keith Thomas and playing the prison game of talking a game. There's nothing to show he ordered anybody to do anything. The order to Mr. Moore was supposedly given by Mr. Thomas long before. Okay. And I don't think it was a fair trial being tried with these co-defendants, and I think that's the reason this should be sent back for a new trial, so he can get a fair trial on this. Thank you. Okay. Thank you very much. Thank all counsel for your helpful argument in this case. The case of the United States v. Fuentes, Moore, and Pablo is now submitted for decision, and we are in adjournment until tomorrow morning. Thank you.
judges: Fernandez, W. Fletcher, Rawlinson